IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RUDOLPH B. TYLER, JR., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) C.A. No. 18-00195 (MN) |
| DIAMOND STATE PORT CORPORATION, | ) ) ) ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

Samuel L. Guy, Wilmington, DE – Attorney for Plaintiff

Barry M. Willoughby, Lauren E.M. Russell, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE – Attorneys for Defendant.

July 26, 2019
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Plaintiff Rudolph B. Tyler, Jr. ("Plaintiff" or "Tyler") originally filed this employment suit against Diamond State Port Corporation ("Defendant")[1] on February 2, 2018. (D.I. 1). He filed a First Amended Complaint ("Amended Complaint") on April 30, 2018. (D.I. 11). In the Amended Complaint, Plaintiff alleges that "[t]his action is brought for discrimination in employment pursuant to Jurisdiction conferred through Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender), Age Discrimination in Employment Act of 1967 [(the 'ADEA')], as codified, 29 U.S.C. §§ 621 to 634, 42 USC 1981 and Constitutional Due Process and Equal Protection." (D.I. 11 ¶ 5). The Amended Complaint also appears to allege retaliation in violation of unspecified statutory or constitutional protections (D.I. 11 ¶ 54), defamation (*id.* ¶ 70), and breach of the implied covenant of good faith and fair dealing (*id.* ¶ 81).

Pursuant to the Court's Scheduling Order, the parties concluded discovery on January 31, 2019. (D.I. 21). Plaintiff did not request any discovery or take any depositions.[2] (D.I. 33 at 1). On March 26, 2019, Defendant moved for summary judgment on all claims. (D.I. 32). Plaintiff failed to respond to Defendant's motion.[3] For the reasons set forth below, the Court will GRANT Defendant's motion.

---

[1] Defendant is a corporation established by the State of Delaware for the purpose of operating the Port of Wilmington ("the Port"). 29 Del. C. § 8780, *et seq*. According to Defendant (D.I. 33 at 2 n.1), "[o]peration of the Port was privatized in September of 2018, when management of its facilities was transferred to GT USA Wilmington, LLC d/b/a GulfTainer." (D.I. 35 at A36). Plaintiff does not dispute that.

[2] Defendant produced documents and responded to discovery requests. To the extent those documents have been submitted to the Court in connection with this motion, they have been considered.

[3] Plaintiff requested an extension until July 24, 2019 to respond to Defendant's March 26, 2019 motion. (D.I. 44). The Court granted Plaintiff an approximately two-week extension (until June 10) and noted that no further extensions would be granted. (D.I. 45). On June

## I. BACKGROUND

The following paragraphs are the facts set forth in Defendant's Statement of Concise Facts (D.I. 34). These facts are supported by the appendix Defendant submitted (D.I. 35), and not disputed by Plaintiff.

1. Plaintiff was employed by Defendant from January 1, 2005 through his termination on May 26, 2016. (D.I. 11 ¶10; D.I. 34 ¶ 1).

2. In the present case, Plaintiff was an at-will employee, who could be terminated at any time, for any reason, with or without cause. (D.I. 35 at A36).

3. At the time of his termination, Plaintiff was employed as a Warehouse Supervisor. (D.I. 11 ¶10; D.I. 34 ¶ 3).

4. As a Warehouse Supervisor, Plaintiff was responsible for overseeing laborers performing a variety of skilled and unskilled tasks. (D.I. 35 at A36).

5. At all times relevant to this litigation, the laborers under Plaintiff's supervision fell into one of three categories: A Employees, B Employees, and Casual Laborers. (D.I. 35 at A36).[4]

6. Casual laborers were used to supplement unionized labor as needed, but especially during the Port's labor-intensive, peak season from late November through late April. (D.I. 35 at A37).

7. Among his many duties, Plaintiff was responsible for tracking and reporting his subordinates' time worked. (D.I. 35 at A37).

8. Generally, A and B Employees work regular schedules. (D.I. 35 at A37).

9. After work assignments are handed out to A and B Employees, any casual laborers who appear for work and are needed to supplement the regular workforce are hired for the day, and their names and start times are entered into the Port's payroll system by Manager of Employment and Employee Relations Andrew Markow. (D.I. 35 at A37, A39).

10. Once on the job, the Warehouse Supervisors enter the actual time worked by casual laborers. (D.I. 35 at A37, A39).

---

10, 2019, Plaintiff filed another motion for an extension (D.I. 46), which the Court denied. (D.I. 48). Plaintiff has not responded to Defendant's motion.

[4] According to Defendant, A and B Employees were represented by the International Longshoremen's Association, Local 1694-1 ("the ILA"). (D.I. 33 at 5 (citing D.I. 35 at A36)).

11. However, not infrequently and especially during the Port's peak season, casual laborers would arrive when Mr. Markow was not present. (D.I. 35 at A39).

12. In such instances, Warehouse Supervisors would hire the casual laborers they needed to complete their assigned work for the day, and send an email or text message to Mr. Markow so that the individual(s) hired could be added to the payroll system for the day. (D.I. 35 at A40).

13. In March 2016, Defendant received an anonymous complaint that Plaintiff's subordinate, Casual Laborer Aketa Rembert, was being paid for time that she had not actually worked. (D.I. 35 at A9, A42; D.I. 11 ¶13; D.I. 23 ¶13).

14. The Port immediately began an investigation under the supervision of Director of Operations Frank Vignuli. (D.I. 23 ¶14; D.I. 35 at A42).

15. The investigation included the review of badge records for Ms. Rembert, which recorded when she entered and exited the Port's premises. (D.I. 35 at A42).

16. While the turn style at which employees scan their badges is not a time clock, it does provide an accurate record of when they enter and exit the Port's premises. (D.I. 35 at A42).

17. Access to the Port, through the use of employee badges, is required and monitored by the U.S. Coast Guard. (D.I. 35 at A42).

18. When there are issues with the accuracy of the turn style, they are resolved immediately. (D.I. 35 at A42).

19. At no time has the system been down for months on end. (D.I. 35 at A42).

20. The investigation also involved review of time records reflecting the periods for which Ms. Rembert was supposed to have been working. (D.I. 35 at A43).

21. The documents reflected that on more than 40 instances from February through April, 2016, Ms. Rembert was paid for full days of work during which she was not present on Port premises, as well as being paid for full days of work on days when she was present, but arrived late. (D.I. 23 ¶ 25; D.I. 35 at A43).

22. The time records at issue were all entered under Plaintiff's name. (D.I. 35 at A10-A26, A43).

23. During this same period, Mr. Markow recalls that Plaintiff was frequently hiring Ms. Rembert directly, and then contacting Mr. Markow to add Ms. Rembert to the payroll system so that she could be compensated. (D.I. 35 at A40).

24. After Mr. Vignuli gathered the evidence outlined above, he met with Plaintiff to obtain his explanation for the inaccurate time entries, but Plaintiff could provide none. (D.I. 23 ¶ 26; D.I. 35 at A43).

25. Consequently, on May 25, 2016, Plaintiff was terminated for engaging in theft of time on behalf of Ms. Rembert. (D.I. 35 at A38, A43).

26. Ms. Rembert continued to work for the Port for the duration of the investigation into the fraudulent time entries. (D.I. 35 at A38).

27. Once Defendant reached its conclusion that Plaintiff had recorded – and Ms. Rembert had benefited from – fraudulent time entries, Ms. Rembert was denied any further work opportunities. (D.I. 35 at A38).

28. The decision was not memorialized in writing because Ms. Rembert had no formal employment relationship with Defendant. (D.I. 35 at A38).

29. Defendant has no record of any substantiated allegation of time theft by Warehouse Supervisor Deana Robinson. (D.I. 35 at A25).

30. In an August 9, 2007 memorandum, Ms. Floyd-Kennard informed Plaintiff that in response to his allegations that racial slurs had been used by the employee of a Port contractor, the offending employee was barred from Port premises and later terminated by the contractor. (D.I. 35 at A1-A4, A30-A35).

31. As with any such allegation, Defendant took Plaintiff's claims seriously, and acted with all due haste to ensure that Plaintiff would never be subjected to racial slurs while on the job site. (D.I. 35 at A1-A4).

32. In February 2016, the pay rates of all Warehouse Supervisors were raised to $29.09 per hour. (D.I. 35 at A8, A43).

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show[] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 n.10 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in original). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson*

4

*Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The Court may not grant summary judgment if a "reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 459 (3d Cir. 1989) (citation omitted).

To defeat a motion for summary judgment, however, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted)). "[The] mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

If a party fails to address another party's assertion of fact, the court may consider the fact undisputed, or grant summary judgment if the facts show that the movant is entitled to it. FED. R. CIV. P. 56(e)(2)-(3). A party's failure to respond to a motion for summary judgment "is not alone a sufficient basis for the entry of a summary judgment." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990). The court must still "find that the undisputed

facts warranted judgment as a matter of law." *Miller v. Ashcroft*, 76 F. App'x 457, 462 (3d Cir. 2003) (citing FED. R. CIV. P. 56; *Lorenzo v. Griffith*, 12 F.3d 23, 28 (3d Cir. 1993)). In other words, the court must still determine whether the unopposed motion for summary judgment "has been properly made and supported." *Williams v. Murray, Inc.*, No. 12-2122, 2014 WL 3783878, at *2 (D.N.J. July 31, 2014) (quoting *Muskett v. Certegy Check Servs., Inc.*, No. 08-3975, 2010 WL 2710555, at *3 (D.N.J. July 6, 2010)) (internal quotation marks omitted).

## III. DISCUSSION

### A. Discrimination Claims

As noted above, Plaintiff asserts race, color, and sex discrimination in violation of Title VII and 42 U.S.C. § 1981, age discrimination in violation of the ADEA, and claims for violation of the Equal Protection Clause of the Fourteenth Amendment. (D.I. 11). Claims of discrimination under each of these theories are reviewed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 151 (3d Cir. 2017) (citing *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014)). The Third Circuit has explained that:

> a plaintiff must first establish a prima facie case of discrimination. If the plaintiff succeeds, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination.

*Id.* (quoting *Ross*, 755 F.3d at 193).

"[T]he burden of persuasion remain[s] at all times with the plaintiff." *Sheriden v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1066 (3d Cir. 1996). To establish a prima facie case, a plaintiff must offer sufficient evidence that: "(1) [he] is a member of a protected class; (2) [he] was qualified for the position he sought to [] retain; (3) [he] suffered an adverse employment

6

action; and (4) similarly situated persons who were not members of [his] protected class were treated more favorably or there are other circumstances that could give rise to an inference of intentional discrimination." *Drummond v. Amazon.com.dedc, LLC*, No. 18-293 (RGA), 2018 WL 5629811, at *5 (D. Del. Oct. 31, 2018) (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)) (internal quotation marks omitted); *see also Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999).

If a prima facie case has been established, "the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment decision." *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 319 (3d Cir. 2000). If the employer can offer "a legitimate, nondiscriminatory reason for its actions," the plaintiff must then "demonstrate that the proffered reason was merely a pretext for unlawful discrimination." *Id.*; *see also Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) ("Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)."). The plaintiff must convince the factfinder "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). "It is not enough, in other words, to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 519 (emphasis in original).

        1.      Prima Facie Case

In its papers, Defendant does not dispute for this motion "that Plaintiff can satisfy the first three elements of his *prima facie* case." (D.I. 33 at 7). It disputes, however, that Plaintiff has met the fourth element, asserting that Plaintiff has not identified any evidence from which "to infer that

7

Defendant's decision to terminate his employment was motivated by intentional discrimination." *Id.* The Court agrees with Defendant.

In support of his claims, Plaintiff made several allegations. First, he alleged that "[t]he employee who allegedly received unearned pay[, Aketa Rembert,] has worked and received pay for their [sic] work subsequent to Plaintiff's termination" and "was not terminated from employment at the port." (D.I. 11 ¶¶17-18). The evidence, however, shows that Ms. Rembert continued to work for the Port only for the duration of the investigation into the questioned time entries, and that once the investigation finished, she was not given further work by Defendant. (D.I. 35 at A38).

Second, Plaintiff alleged that "other port supervisors have entered time for employees that actually did not work" and none of those individuals "have been terminated."[5] (D.I. 11 ¶¶22-23). Showing of preferential treatment of similarly situated comparators can prove discriminatory intent. *Vernon v. A&L Motors*, 381 F. App'x 164, 167 (3d Cir. 2010) ("The identification of [a similarly situated individual outside of his protected class] may give rise to an inference of unlawful discrimination."). Here, however, with one exception, Plaintiff has failed to identify the alleged comparators. There is thus no evidence as to who the comparators are or that they were outside of his asserted protected categories or that they were actually treated preferentially.

The only person that Plaintiff identified is Warehouse Supervisor Dean'a Robinson, who Plaintiff claims "was not terminated [or] discharged for improperly paying employees and showing favoritism to family members." (D.I. 11 ¶65). There is, however, no record of any substantiated

---

[5] Plaintiff alleged in his Amended Complaint, without any support, that Ms. Floyd-Kennard and Mr. Vignuli told him "that other port supervisors have entered time for employees that actually did not work." (D.I. 11 ¶ 22). There is no evidence before the Court to support those conclusory statements.

8

allegation of time theft by Ms. Robinson, and nor is there any evidence of misconduct by her in the record. Thus, Ms. Robinson is not a valid comparator. *See Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998) (holding that in evaluating whether employees engaged in similar misconduct, "the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action").

Third, Plaintiff raises claims regarding allegedly discriminatory terms and conditions of employment prior to his termination.[6] For example, Plaintiff claims that he "was called a nigger to his face" yet none of Defendant's managers "did anything about it." (D.I. 11 ¶54). The record, however, belies Plaintiff's allegation as to Defendant's response. (D.I. 35 at A1-A4). For example, in an August 9, 2007 memorandum, Ms. Floyd-Kennard responded to a number of incidents raised by Plaintiff. In that memo, she informed Plaintiff that in response to his allegations that racial slurs had been used by the employee of a Port contractor, the offending employee "could not be on port property conducting himself in such an offensive manner" and was later "fired." (D.I. 35 at A3; *see also id.* at A35 (Plaintiff's response to interrogatories)). The only evidence before the Court is that Defendant took Plaintiff's claims seriously and addressed the issues.

Finally, Plaintiff alleged that "[n]o pay scale for Plaintiff's position was provided allowing for arbitrary and discriminatory pay rates to be implemented." (D.I. 11 ¶ 60; *see also id.* ¶ 68). There is no further support for Plaintiff's allegation or indication as to how his pay compared to others. It appears, as noted above, that Plaintiff was not a unionized employee. *See supra* note 6. The record indicates that in February of 2016 due to a pay raise negotiated by the ILA on behalf

---

[6] In his Amended Complaint, Plaintiff made allegations comparing his treatment to other individuals with less seniority. (D.I. 11 ¶¶49-51). It appears, however, that Plaintiff was not a unionized employee and thus according to Defendant, Defendant's employment decisions about Plaintiff "were made without consideration of any alleged seniority." (D.I. 33 at 8 n.16).

9

of its members, Plaintiff was making less than the employees he supervised. To address that, the pay rates of all Warehouse Supervisors were raised to $29.09 per hour. (D.I. 35 at A8; *id.* at A43). Thus, Plaintiff was not paid less than similarly situated comparators on the basis of discriminatory animus.

In sum, Plaintiff cannot meet his burden to present evidence of prima facie discriminatory animus, and no reasonable jury could return a verdict for Plaintiff on those claims.[7] Moreover, even if the Court were to construe Plaintiff's allegations as sufficient to establish a prima facie claim for discrimination, summary judgment would be appropriate because Plaintiff has failed to rebut Defendant's contentions that his termination was based on non-discriminatory factors. Thus, summary judgment on these claims is appropriate.

### B. Retaliation Claims

Plaintiff asserts that he "was retaliated against for engaging in the protected activity of bringing the discriminatory actions of the [Port] to the attention of management." (D.I. 11 ¶ 67). Claims of retaliation under Title VII and the ADEA are subject to the same *McDonnell-Douglas* analysis outlined above. *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701 (3d Cir. 1995). Thus, to establish a prima facie case of retaliation, Plaintiff must demonstrate that (1) he engaged in protected activity, (2) he suffered an adverse employment action contemporaneous with or after the protected activity, and (3) there is a causal link between the protected activity and the adverse employment action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000); *Barber*, 68 F.3d at 701; *Price v. Del. Dep't of Corr.*, 40 F. Supp. 2d 544, 551-52 (D. Del. 1999). Claims

---

[7] As Defendant points out, "Plaintiff's claim of age discrimination appears to arise from his belief that he was the youngest supervisor and was punished for his youth." (D.I. 33 at 9 n.17 (citing D.I. 11 ¶52)). "The purpose of the ADEA is to prohibit stereotypes about age – the statute does not protect individuals on the basis of their relative youth." *Id.* (citing 29 U.S.C. § 621).

10

of retaliation under Title VII and the ADEA "require proof of the employer's retaliatory intent." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).

Here, Plaintiff asserts that the protective activity was bringing discriminatory actions to attention of Port management. To engage in protected activity, an employee must make a complaint specific enough to notify management of the particular discrimination at issue. *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010). A "general complaint of unfair treatment does not translate into a charge of illegal . . . discrimination." *Barber*, 68 F.3d at 702.

Here, the Amended Complaint states that "Plaintiff was retaliated against by Frank Vignuli . . . on an ongoing basis." (D.I. 11 ¶57; *see also id.* ¶67). It does not identify, however, what protected activity he engaged in, when he engaged in the activity, and what causal connection exists between the protected activity and his termination.[8] Plaintiff's document production suggests three instances of protected activity, in August 2007 (D.I. 35 at A1-A4), December 2009 (*id.* at A5-A6), and July 2011 (*id.* at A7-A8). These events, however, are sufficiently distant from Plaintiff's termination in 2016 that the Court cannot infer retaliatory intent based on them. *See, e.g.*, *Starling v. Potter*, No. 07-541 (JJF), 2010 WL 538700, at *13 (D. Del. Feb. 12, 2010) ("A span of mere months, let alone years, between the protected activity and the adverse action is insufficient to raise an inference of causation"); *see also McCann v. Astrue*, 293 F. App'x 848, 852

---

[8] Plaintiff also asserts that in 2015, he "reminded Vignola about the port drug and alcohol requirements." (D.I. 11 ¶49). Objections to a violation of an internal company policy is not protected activity, *i.e.*, it is not opposition to "any practice made an unlawful employment practice by [subchapter VI], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [subchapter VI]." 42 U.S.C. § 2000e-3(a).

11

(3d Cir. 2008) (the alleged retaliatory act five months after complaints was insufficient to support prima facie case of retaliation).

Moreover, absent additional evidence, courts have rejected an employee's conclusory allegations of misconduct as sufficient to sustain a claim of misconduct against an employer. *Perez v. N.J. Transit Corp.*, 341 F. App'x 757, 760 (3d Cir. 2009) ("Conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." (internal quotation omitted)); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) (same); *Le v. City of Wilmington*, 736 F. Supp. 2d 842, 854 (D. Del. 2010) ("Le's subjective beliefs that wrongdoing occurred, without any evidence in support of those claims, are not sufficient to establish a genuine issue of material fact and overcome summary judgment."); *Sullivan v. Nationwide Life Ins. Co. of Am.*, 720 F. Supp. 2d 483, 510 (D. Del. 2010) ("Plaintiff needs more than his subjective belief to survive summary judgment and he has not presented any corroborating evidence.").

### C. Procedural Due Process Claims

The due process clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Here, Defendant concedes that Plaintiff appears to assert claims of deprivation of property and liberty interests without adequate procedural due process. (D.I. 33 at 11).

First, as to property interest, it appears that Defendant's allegations relate to the termination of his employment. "Constitutionally protected property interests are created and defined by an independent source, such as state law." *Lloyd v. Jefferson*, 53 F. Supp. 2d 643, 661 (D. Del. 1999) (citing *Walls v. City of Milford,* 938 F. Supp. 1218, 1221 (D. Del. 1996)). Thus, to prove a violation of procedural due process as to property, Plaintiff must establish that he was deprived of a legally cognizable property interest in his continued employment. *Id.* at 661 (citing *Kelly v. Borough of*

*Sayreville, N.J.*, 107 F.3d 1073, 1076-77 (3d Cir. 1997)). A plaintiff's "mere subjective expectancy is insufficient to raise the interest to the level of a constitutionally protected property interest." *Thorpe v. Lank*, No. 87-456, 1988 WL 135429, at *4 (D. Del. Dec. 13, 1988). Here, Plaintiff was an at-will employee, and he has not identified any source of protection for his employment beyond his "subjective expectancy." In the absence of such a legally cognizable property interest in his continued employment, Plaintiff has no claim for due process for a property interest.

As to a liberty interest, Plaintiff asserts that he was deprived of a liberty interest when "DSPC creat[ed] and disseminat[ed] . . . [a] false and defamatory impression of Plaintiff in the port community in connection with his termination." (D.I. 11 ¶74). The Third Circuit, however, has held that "reputation alone is not an interest protected by the Due Process Clause." *Versarge v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1371 (3d Cir. 1993) (quoting *Clark v. Twp. of Falls*, 890 F.2d 611, 619 (3d Cir. 1989)). Instead, to state a claim for deprivation of liberty without due process, a plaintiff must "show a stigma to his reputation *plus* deprivation of some additional right or interest." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (emphasis in original). This "stigma plus" test is satisfied when an employer creates and disseminates "a false and defamatory impression" and then terminates the employee. *Id.* Here, however, there is no evidence that Defendant took any action to create or disseminate false information to third parties, outside of those managers with a legitimate business need to know. And there is no record evidence of any publication to third parties by Defendant.

Because Plaintiff had neither a protected property interest in his continued employment, nor a protected liberty interest in his reputation, no reasonable jury could return a verdict for Plaintiff on his procedural due process claims.

### D. Defamation Claims

To establish a claim of common law defamation, plaintiff must show five elements: "1) the defamatory character of the communication; 2) publication; 3) that the communication refers to the plaintiff; 4) the third party's understanding of the communication's defamatory character; and 5) injury." *Spanish Tiles, Ltd. v. Hensey*, No. 05C-07-25 RFS, 2005 WL 3981740, at *6 (Del. Super. Ct. Mar. 30, 2005); *see also Read v. Carpenter*, No. 95C-03-171, 1995 WL 945544, at *2 (Del. Super. Ct. June 8, 1995), *aff'd*, 670 A.2d 1340 (Del. 1995) (citing *Los v. Davis,* Del.Super., C.A. No. 89C-OC-122, Goldstein, J., Opinion and Order at 3 (Apr. 9, 1991), *aff'd,* Del.Supr., 602 A.2d 1081 (1991) (quoting *Re v. Horstmann,* Del.Super., C.A. No. 83C-FE-82, Poppiti, J. (Aug. 11, 1987))).

Here, the sum total of Plaintiff's allegations regarding defamation were (D.I. 11):

70. Defendant DSPC through Frank Vignuli and other port staff and employees defamed Plaintiff by simultaneously terminating him and falsely and publicly accusing him of stealing time.

71. Plaintiff has a good name, reputation, honor, and integrity amongst the port community.

72. Plaintiff was not provided notice and an opportunity to heard regarding the false allegations distributed by the DSPC.

74. Plaintiff has been deprived of his protected liberty interest through the DSPC creation and dissemination of the false and defamatory impression of Plaintiff in the port community in connection with his termination.

75. The false and defamatory accusations about Plaintiff were widely distributed throughout the port to DSPC employees and staff and beyond.

76. The allegation of stealing time has harmed Plaintif's reputation.

77. Plaintiff was never provided a name clearing hearing.

78. Plaintiff was defamed in the course of being terminated constituting a stigma-plus defamation claim.

Aside from a conclusory reference to being "defamed" and "defamatory" statements, Plaintiff offers no support for his allegations. And aside from identifying Mr. Vignuli, Plaintiff

does not identify the others or when, where, or to whom these allegedly defamatory statements were made. (D.I. 35 A28-A35). Plaintiff also does not allege what, if any, injury resulted from the alleged defamation other than the conclusory statement that "[t]he allegation of stealing time has harmed Plaintiff's reputation." (D.I. 11 ¶ 76).[9] Absent any evidence in the record, there are no issues of material fact in dispute and summary judgement is appropriate.

### E. Breach of Contract Claims

As Defendant notes, Plaintiff alleges that "the duty of good faith and fair dealing has been violated" by Defendant. (D.I. 11 ¶ 81). Here, Plaintiff was an at-will employee. Every employment contract, however, is subject to the implied covenant of good faith and fair dealing, which provides limited restrictions to the at-will doctrine. *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 830 (Del. 2005); *see also Johnson v. Ace Cash Express Inc.*, No. 13-1186-LPS, 2015 WL 4397482, at *2 (D. Del. July 17, 2015) ("In Delaware, '[a]ll contracts are subject to an implied covenant of good faith and fair dealing.'" (alteration in original)) (quoting *Fitzgerald v. Cantor*, No. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)). Indeed, "Delaware law has evolved . . . through recognition of a limited implied covenant of good faith and fair dealing as an exception to the harshness of the employment at-will doctrine." *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000).

As the Delaware Supreme Court has noted, "implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del. 1998). Thus, that court has catalogued actionable

---

[9] In connection with other allegations, Plaintiff asserts that "[a]s a direct result of the discriminatory and retaliatory conduct of Defendant, Plaintiff has suffered damages, including, but not limited to, severe emotional distress, pain and suffering, mental anguish, humiliation, benefits, and lost wages." (D.I. 11 ¶ 82).

15

claims for breach of this duty of good faith and fair dealing into four categories: "(i) where the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied 'thereon either to accept a new position or remain in a present one'; (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination." *Lord*, 748 A.2d at 400 (citing *E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 442-444 (Del. 1996)). To obtain relief for its breach of good faith and fair dealing contract claim, Plaintiff would have to show that Defendant's actions fall into one of these categories.

Here, Plaintiff does not identify which, if any, of these categories, he relies on. In its papers, Defendant presumes that "Plaintiff relies upon the first and fourth grounds." (D.I. 33 at 14). As to the first ground – that the termination violated public policy because it was based on discrimination or retaliation – Plaintiff had an exclusive statutory remedy under state law. 19 Del. C. § 712(b) ("This subchapter shall afford the sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies."). He did not, however, bring any claims under the Delaware Discrimination in Employment Act in this case. His choice not to file claims using his "sole remedy" does not permit him to assert contract claims for breach of good faith and fair dealing.

As to the fourth ground – that the employer falsified or manipulated employment records to create fictitious grounds for termination – Plaintiff does not assert that any of the records relied upon by Defendant or produced in this case are false or manipulated. To the contrary, Plaintiff concedes that the investigation revealed "in excess of 40 discrepancies" between Ms. Rembert's badge records and her time records. (D.I. 11 ¶¶ 19, 25). While he asserts that he did not engage

16

in any misconduct, Plaintiff has not challenged the accuracy of the records themselves. Consequently, no reasonable jury could return a verdict for Plaintiff, and summary judgment is appropriate.

## IV. CONCLUSION

For the reasons set forth above, the Court grants Defendant's motion for summary judgment. An appropriate Order will be entered.